## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| **MONOLESA FITZPATRICK,** | ) | |
| | ) | |
| **Plaintiff**, | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **CIVIL ACTION NO.** |
| **KOCH FOODS OF ALABAMA,** | ) | **2:19-cv-00553-JTA** |
| **LLC,** | ) | |
| | ) | |
| **Defendant**. | ) | |

---

## DEFENDANT'S BRIEF IN SUPPORT
## OF ITS MOTION FOR SUMMARY JUDGMENT

---

Pursuant to Rule 56 of the *Federal Rules of Civil Procedure*, Defendant Koch Foods of Alabama, LLC ("Defendant" or "Koch Foods"), submits this brief in support of its Motion for Summary Judgment. As addressed *infra*, there is no genuine issue of material fact, and Koch Foods is entitled to summary judgment as to Fitzpatrick's Title VII and § 1981 retaliation claims as a matter of law.  In support thereof, Koch Foods states as follows:

## I.     INTRODUCTION.

Fitzpatrick worked a little over two (2) years as a production line worker for Koch Foods. During her employment, Fitzpatrick was suspended three (3) different times for refusal to follow instructions and unruly behavior when she was asked to

perform a job she did not want to do. Her disruptive, argumentative conduct was noted by multiple different supervisors and HR employees. In January of 2019, Fitzpatrick had a verbal altercation with a co-worker during which multiple employees reported that Fitzpatrick used vulgar and profane language toward another this co-worker and threatened violence. Although Fitzpatrick denies she engaged in this conduct, she does not dispute her co-workers reported to the human resources department that they saw and heard her do so. Under Koch Foods' policies, a threat of violence results in immediate termination. Accordingly, Fitzpatrick was terminated after the company's investigation revealed Fitzpatrick cursed a co-worker, made a threat of violence, and left her work area without permission.

Fitzpatrick's Second Amended Complaint presents only two (2) claims: retaliatory termination under Title VII and § 1981. (Doc. 34). Specifically, Fitzpatrick alleges she was terminated because of her purported internal complaints about being called a voodoo practitioner and because she filed EEOC Charges. (Doc. 34, ¶¶ 38-39, 45-46). Summary judgment is due to be granted in Koch Foods' favor because Fitzpatrick cannot show but for causation in that (1) there is no evidence that the decisionmaker was aware of any internal complaints of discrimination and Fitzpatrick continued working for five (5) months without problem after she filed her last EEOC Charge in August of 2018 until she was

terminated in early February of 2019; and (2) Fitzpatrick admits that her co-workers, including those she identified as witnesses to the altercation, reported she engaged in misconduct requiring automatic termination under Koch Foods' policies.

Summary judgment is warranted on Fitzpatrick's § 1981 claim for the additional reasons that (1) Fitzpatrick's sworn testimony makes clear the complained-of conduct was based upon her Jamaican culture rather than her African race; and (2) Fitzpatrick cannot show any decisionmaker had knowledge of any complaints of race discrimination as opposed to national origin discrimination. Thus, § 1981 provides no cause of action for Fitzpatrick's claims.

## II.   STATEMENT OF MATERIAL, UNDISPUTED FACTS.

### A.   Koch Foods of Alabama.

Koch Foods of Alabama has two plants within the same facility in Montgomery, Alabama: the processing plant where poultry is slaughtered and the debone plant where the chicken product is separated and packaged according to customer specifications. (Deposition of Nikki Bibb, 16:5-17:3, filed as **Exhibit 1**). Koch Foods has policies which prohibit discrimination based upon race or national origin and reporting procedures for employees to report unlawful discrimination through multiple avenues.  (Koch Foods EEO Policy and Reporting Procedures, file

as **Exhibit 2**). Fitzpatrick received a copy of this policy when she began her employment. (Deposition of Monolesa Fitzpatrick, 19:4-18, filed as **Exhibit 3**).

### B.    Fitzpatrick's Employment with Koch Foods.

Fitzpatrick began working at Koch Foods debone plant on January 24, 2017, as a Tender Clipper, which is also known as a "Tender Puller." Fitzpatrick first worked under Shainta Little who was a line supervisor. (Sworn Statement of Shainta Little at ¶2,filed as **Exhibit 4**).

Fitzpatrick was trained on Koch Foods' policies at the beginning of her employment. (See Orientation Checklist for Personnel File, attached as **Exhibit 5**). On February 14, 2018, Fitzpatrick acknowledged that she read and understood the Rules of Conduct. (Rules of Conduct Acknowledgement, attached as **Exhibit 6**). Pursuant to Koch Foods' Rules of Conduct, Fitzpatrick understood the following misconduct would result in immediate termination:

- Job Abandonment: …leaving an assigned work area or work station during work hours without supervisor permission ….

- Fighting or provoking a fight (DO NOT PLACE HANDS OF OTHER PEOPLE OR USE PROVOKING LANGUAGE)

- Cursing co-workers, supervisors, management, visitors, vendors, or customers

- Threats of violence or terrorism toward anyone.

(Fitzpatrick Depo. 19:24-21:1).

Occasionally, Fitzpatrick would work as a Tender Scorer, which has a higher

pay rate. Fitzpatrick received higher pay when she worked as a Tender Scorer. (Sworn Statement of Shainta Little at ¶¶ 7-8, Ex 4; Personnel Action Forms for Premium Pay, filed as **Exhibit 7**). On November 14, 2017, Little promoted Fitzpatrick to a full-time Tender Scorer. (See 11/14/17 PAF, filed **Exhibit 8**). Once a Tender Scorer, Fitzpatrick was still required to rotate positions on the line as part of Koch Foods' OSHA practices to prevent wear and tear on employees from performing repetitive motions. (Little Statement, Ex 4 ¶ 6).

In December of 2017, Ms. Fitzpatrick was asked to stand in for another employee on the line so that employee could use the restroom. Ms. Fitzpatrick refused, and that employee ended up using the restroom on herself. (Little Statement, Ex 4 ¶ 5). Little escorted Ms. Fitzpatrick to human resources for her insubordination. Ms. Fitzpatrick was angry and yelling in the HR office. (Little Statement, ¶ 5, Ex. 4). The human resources employee made the decision to suspend Ms. Fitzpatrick pending investigation and documented on the suspension form that Fitzpatrick was "irate" in the HR office. (12/7/17 Employee Warning Reports, filed as **Exhibit 9**). Ultimately, the HR manager at that time, Lisa Wright, voided the suspension because she determined Ms. Fitzpatrick was not required to relieve the other employee because Ms. Fitzpatrick was not a line lead. (*Id*; Little Statement, ¶ 6, Ex. 4). Ms. Fitzpatrick was brought back to work and paid for the days she was out on suspension. (1/15/18 Personnel Action Form, filed as **Exhibit 10**).      Because of

the suspension, Fitzpatrick filed a Charge of Discrimination with the Equal Employment Opportunity Commission on December 21, 2017. (12/21/17 EEOC Charge, filed as **Exhibit 11**).

On February 8, 2018, Tiekya Needham ("Needham") asked Fitzpatrick to pull tenders and she refused. Needham reports that Fitzpatrick responded, "fuck this shit" and "I will go home." (Sworn Statement of Tiekya Needham, ¶ 4, filed as **Exhibit 12**; see also Shan Brantley Statement, filed as **Exhibit 13**). At that time, Needham worked on the production line with Fitzpatrick, but would occasionally fill in as a team lead. (*Id.* at ¶ 4). Fitzpatrick admits that she refused to follow Needham's instruction because she did not fell that pulling tenders was part of her "job description." (2/9/18 Fitzpatrick Statement, filed as **Exhibit 14**). When Needham informed Little about Fitzpatrick's refusal, Little directly instructed Fitzpatrick to pull tenders. (Little Statement, Ex 4 ¶ 6; 2/8/18 Employee Warning Report, filed as **Exhibit 15**).  Little also counseled Fitzpatrick that she was not permitted to chew gum on the production floor. (*Id.*). Fitzpatrick persisted in her refusal and said she was going to go home. (*Id.*). Little escorted Fitzpatrick to HR office to meet with HR personnel and the union steward. (*Id.*). Fitzpatrick was suspended without pay for her insubordination and failure to follow instructions. (*Id.*).

On May 7, 2018, Fitzpatrick filed a second EEOC Charge in which she alleged that Little ignored her requests to use the restroom in retaliation for her earlier EEOC

Charges. (5/7/18 EEOC Charge, filed as **Exhibit 16**) Little denies doing so. (Little Statement, ¶3, Ex. 4). Nevertheless, it is undisputed Little had no knowledge during Fitzpatrick's employment of Fitzpatrick filing EEOC Charges or otherwise making any complaints of discrimination. (Little Statement, ¶ 11, Ex 4; Fitzpatrick Depo. 194:16-195:1).

On or about July 24, 2018, an earring was discovered in the chicken product. Fitzpatrick's supervisor at that time, Davis Vernon ("Vernon") inspected all employees' ears who were working on the line to see if they were wearing earrings in violation of Koch Foods' good manufacturing policies. In so doing, Vernon pulled Fitzpatrick's hair net away from her head so that he could inspect her ears. Fitzpatrick submitted a written complain to HR about Vernon touching her hair net and claimed she felt "very violated." (7/24/18 Fitzpatrick Statement, filed as **Exhibit 17**). Bizarrely, Fitzpatrick also went to the police station to fill out a police report regarding Vernon touching her hairnet. (Municipal Court Deposition, filed as **Exhibit 18**). Neither of Fitzpatrick's complaints, however, mentioned any purported mistreatment based upon her race, national origin, or any alleged retaliation.

On August 16, 2018, the team lead asked Fitzpatrick to work line 4. Vernon reported to HR that Fitzpatrick got into an argument with the team lead, refused to perform the assigned work, and caused a "mass disruption." (8/16/18 Employee Warning Report, filed as **Exhibit 19**). Fitzpatrick admitted that she argued with the

team lead about performing the breast pulling and complained that she should be allowed to do a different job instead because her hands were hurting. (8/16/18 Fitzpatrick Statement, filed as **Exhibit 20**). Fitzpatrick's statement made no mention of any harassing or discriminatory treatment based upon her race or national origin. Fitzpatrick was suspended for her unruly behavior. There is no evidence Vernon had any knowledge of Fitzpatrick's EEOC Charges at the time he checked Fitzpatrick for earrings or at the time of the August 2018 suspension. (Fitzpatrick Depo. 147:25-148:2; 194:16-195:1).

The next day, on August 17, 2018, Fitzpatrick filed a third EEOC Charge alleging national origin discrimination and retaliation based on the August 2018 suspension and Vernon pulling back her hair net to check for earrings. (8/17/18 EEOC Charge, **Exhibit 21**).

As of January of 2019, Constance Wyckoff was Fitzpatrick's line supervisor. (Sworn Statement of Constance Wyckoff Morgan, ¶¶ 2-4, filed as **Exhibit 22**). On or about January 28, 2019, Wyckoff investigated why the line stopped. (*Id.* at ¶ 4). Wyckoff discovered there was a disagreement between Fitzpatrick and another employee named Tanya McCaskey. (*Id.* at ¶ 4).   Fitzpatrick complained that McCaskey had deliberately sprayed her with water from a hose. (*Id.* at ¶ 4). McCaskey denied doing so. (*Id.* at ¶ 4; Statement of Tonya McCaskey Orum, ¶ 5, filed as **Exhibit 23**).   McCaskey reported that Fitzpatrick called her a "fucking

whore" and said she was selling her body "like a prostitute." (Wycoff Morgan Statement, ¶ 4, McCaskey Orum Statement, ¶ 5). Wyckoff escorted McCaskey and Fitzpatrick to human resources for HR personnel to investigate and resolve the issue. (Wycoff Morgan Statement, ¶ 4). After Fitzpatrick gave her written statement about the incident to HR, Wyckoff escorted her back to the production floor. (Wycoff Morgan Statement, ¶ 4). Fitzpatrick wrote statements in which she claimed that McCaskey was threatening and bullying her. (1/28/19 Fitzpatrick Statements, filed as **Exhibit 24**). McCaskey also provided a written statement to HR in which she named multiple witnesses, including Kalmetrice Kemp, Jennifer Howard, Courtney Brown, and Emma (last name unknown). (McCaskey Orum Statement, ¶ 7). Notably, Fitzpatrick told McCaskey that HR would not do anything to her because she had pending lawsuit. (*Id.* at ¶ 8).

The Complex Human Resources Manager, Nikki Bibb ("Bibb") investigated the incident, including obtaining statements from the witnesses. (Investigation Summary, filed as **Exhibit 25**). Kalmetrice Kemp confirmed that Fitzpatrick called McCaskey a "bitch" and "whore" and threatened to beat her up. (Kemp Statement, filed as **Exhibit 26**). Brown confirmed that Fitzpatrick was using profanity toward McCaskey and threatened to beat her. (Brown Statement, filed as **Exhibit 27**). Howard confirmed that she did not see McCaskey spray Fitzpatrick with water. (Sworn Statement of Jennifer Howard, ¶ 5, filed as **Exhibit 28**). Howard relayed

that McCaskey and Fitzpatrick argued and that Fitzpatrick kept yelling at McCaskey after McCaskey tried to walk away. (*Id.* at ¶ 6).  Howard also relayed that she heard Fitzpatrick say she was going to "do something" to McCaskey. (*Id*).  Importantly, Fitzpatrick identified Howard as witness. (Fitzpatrick Depo. 182:20-183:18).

On the day after the altercation with McCaskey, Fitzpatrick left her production line without permission to go to the human resources department at the processing plant. (Wyckoff Statement, Ex 22 ¶ 5). Fitzpatrick admits she did not have permission to leave her line. (Fitzpatrick Depo. 181:1-8). Fitzpatrick should have gone to the human resources department at the debone facility where she worked which had her personnel records. (Bibb Depo., 20:14-21:9).  Bibb received a call from the HR clerk at the processing plan who told Bibb that Fitzpatrick wanted to make a statement. At that same time, Wyckoff informed Bibb she was looking for Fitzpatrick because Fitzpatrick left the line without permission. (Wyckoff Statement, Ex 22 ¶ 5).  Bibb met with Fitzpatrick, Wyckoff, and the union steward, Steve Jackson, to discuss the incident from the previous day and Fitzpatrick leaving her work area without permission. (Wyckoff Statement, Ex 22 ¶ 6). Bibb suspended Fitzpatrick pending investigation. Bibb obtained a statement from another potential witness, Comario Henderson, who could not corroborate either Fitzpatrick or McCaskey's version. (Henderson Statement, filed as **Exhibit 29**). After considering all of the employee statements, Bibb determined that Fitzpatrick had violated several

Type I Rules of Conduct, including making threats of violence, fighting or provoking a fight, cursing co-workers, and job abandonment, for which the penalty is automatic termination. Accordingly, Bibb terminated Fitzpatrick's employment.

### C.    Fitzpatrick's Internal Complaints to Koch Foods.

Fitzpatrick alleges, shortly after she began her employment with Koch Foods, a line leader named "Wanda" called her a "witch" and a "voodoo worker." (Fitzpatrick Depo. 29:12-33:8). The third time Wanda purportedly made these comments, Fitzpatrick alleges she complained to human resources employees whose names she does not know. (*Id.*) However, Fitzpatrick's complaint to the unidentified HR employees was only that she was being "bullied." (*Id.*). A few weeks later, Fitzpatrick alleges she told an unidentified female HR clerk that "they were calling [her] voodoo lady." (Fitzpatrick Depo. 37:14-39:21). According to Fitzpatrick, she was transferred to a different line in response to this complaint. Fitzpatrick did not make further complaints to HR about these comments. (Bibb Depo., 69:3-9). None of Fitzpatrick written statements that she provided to Koch Foods HR employees mention any of these alleged comments or any alleged discriminatory treatment based upon her race or national origin.

### D.    The EEOC's Determinations that Fitzpatrick's Claims Lack Merit.

On December 14, 2018, the EEOC issued a Notice of Right to Sue and letter to Ms. Fitzpatrick regarding the second EEOC Charge filed by Fitzpatrick in August

of 2018.  The investigator stated as follows: "We wanted to follow-up with you to advise you that based on an analysis of the material and testimony obtained during the investigation, the Commission has concluded that it is unlikely that additional investigation will result in a finding that the law was violated, as alleged." (12/14/18 EEOC Letter and NRTS, filed as **Exhibit 30**).

On May 1, 2019, the EEOC issued a Notice of Right to Sue as to Ms. Fitzpatrick's third EEOC Charge (No. 420-2018-01539) stating that "no reasonable cause is recommended based on the evidence obtained during the investigation." (5/11/19 EEOC Recommendation for Closure and NTRS, filed as **Exhibit 31**).

On May 2, 2019, the EEOC issued a Dismissal and Notice of Right to Sue as to Ms. Fitzpatrick's first EEOC Charge (No. 420-2018-00733), stating that "[b]ased upon a review of the initial information provided, we are unable to conclude that the information obtained established a violation of the statutes." (5/2/19 EEOC Letter and NTRS, filed as **Exhibit 32**). The EEOC investigator recommended that Fitzpatrick's first Charge be dismissed "due to unsubstantiated allegations of discrimination." (4/26/19 EEOC Recommendation for Closure, filed as **Exhibit 33**).

On August 6, 2019, the EEOC investigator recommended closure of Fitzpatrick's fourth EEOC Charge (420-2019-00957). The investigator determined as follows:

> The evidence fails to establish that CP was discriminated against as alleged. R contends CP was terminated for misconduct. R contends CP

was involved in an incident with another employee. R contends that CP cursed out her coworker, threated to harm her and left her place of work without permission … CP was provided a copy [of] R's position statement (PS) on 4/25/2019, and given the opportunity to provide additional information to support her claim and refute R's defense. Called CP on 7/25/2019 to conduct a PDI but received no answer. CP has not provided any information to refute R's claim that she was terminated for violation of their rules of conduct. I recommend dismissal of this charge and the issuance of a NTRS, based on the evidence disclosed in the investigation.

(8/6/19 EEOC Recommendation for Closure, filed as **Exhibit 34**).

## III.   STANDARD OF REVIEW.

"Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Brown v. Crawford*, 906 F.2d 667, 669 (11th Cir. 1990) (quoting Fed. R. Civ. P. 56(c)). However, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment...." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). Nor is the "mere existence of a scintilla of evidence" sufficient; "there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252. The Eleventh Circuit has held "[a] 'mere scintilla' of evidence is insufficient; the non-moving party must produce substantial evidence in order to defeat a motion for summary judgment." *Garczynski v. Bradshaw*, 573 F.3d 1158, 1165 (11th Cir. 2009); *Hoffman v. Allied Corp.*, 912 F.2d 1379, 1383 (11th Cir.

1990) ("If, so viewed, reasonable jurors could find a verdict for the nonmoving party under the substantive evidentiary standard, the nonmoving party can defeat summary judgment."); *State Farm Life Ins. Co. v. Gutterman*, 896 F.2d 116, 118 (5th Cir. 1990) (explaining the nonmoving party must bring forward "significant probative evidence" at summary judgment which may be equated with the "substantial evidence" standard used for directed verdicts); *Moore v. Philip Morris Co*., 8 F.3d 335, 340 (6th Cir.1993) (the nonmoving party must present "significant probative evidence" to defeat the a summary judgment motion).

## IV.   ARGUMENT.

### A.   Fitzpatrick's Title VII Claim Fails As a Matter of Law.

#### 1.   Fitzpatrick cannot show any protected conduct was the but for reason for her termination.[1]

To establish a *prima facie* case of retaliation, Fitzpatrick must show: "(1) [s]he engaged in statutorily protected conduct; (2) [s]he suffered a materially adverse action; and (3) there was a causal connection between the protected conduct and the

---

[1] Although Fitzpatrick was suspended in 2017 and 2018, the only adverse action referenced in her Amended Complaint is her termination. (Doc. 34). Moreover, with respect to her suspension in 2018, the EEOC issued a no cause determination and notice of right to sue in December of 2018 as to Fitzpatrick's contention that the suspension was in retaliation for her 2017 Charge of Discrimination. (Ex. 30). Fitzpatrick did not file suit until August 1, 2018 – well past the ninety (90) day statute of limitations. Thus, any claim based upon the 2018 suspension is time-barred as a matter of law. *See Santini v. Cleveland Clinic Fla*., 232 F.3d 823, 825 (11th Cir. 2000) ("Title VII and ADEA actions may not be brought more than 90 days after a complainant has adequate notice that the EEOC has dismissed the Charge.").

adverse action." *Brungart v. BellSouth Telecomms., Inc.*, 231 F.3d 791, 798 (11th Cir. 2000). Moreover, the Supreme Court has held that an employee asserting a retaliation claim must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer. *See Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2534 (2013). To establish causation, at a minimum, the employee must generally show that the decision maker was aware of the protected conduct at the time of the adverse employment action. *See Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir.1993); *Raney v. Vinson Guard Serv., Inc.*, 120 F.3d 1192, 1197 (11th Cir.1997) ("[I]n a case involving a corporate defendant the plaintiff must show that the corporate agent who took the adverse action was aware of the plaintiff's protected expression...."). "That requirement rests upon common sense. A decision maker cannot have been motivated to retaliate by something unknown to him." *Brungart v. BellSouth Telecommunications, Inc.*, 231 F.3d 791, 799 (11th Cir. 2000).

In addition, when an employee relies upon temporal proximity alone to prove retaliation, the timing must be "very close." *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273, 121 S.Ct. 1508, 1511, 149 L.Ed.2d 509 (2001) (internal citations omitted). "A three to four month disparity between the statutorily protected expression and the adverse employment action is not enough." *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007). Thus, a claim of retaliation

fails as a matter of law "[i]f there is a substantial delay between the protected expression and the adverse action in the absence of other evidence tending to show causation." *Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2004).

Fitzpatrick alleges she was retaliated against for her internal complaints and filing EEOC Charges. However, Wyckoff, who referred Fitzpatrick to HR for discipline after her fight with McCaskey, had no knowledge of Fitzpatrick's EEOC Charges. (Wyckoff Statement, ¶ 8, Ex 22). Similarly, Bibb had no knowledge of Fitzpatrick's purported internal complaints to human resources. (Bibb Depo., 69:3-9). Bibb testified she did not receive Fitzpatrick's EEOC Charges and was not sure if she knew about them when she made the decision to terminate Fitzpatrick's employment. (Bibb Depo. 76:1-78:4).[2] Notably, Bibb did not become the Complex HR Manager with Koch Foods until sometime in 2018. (Bibb Depo. 9:19-10:3).

---

[2] To the extent Fitzpatrick relies upon her allegation that Bibb mentioned her EEOC charges when she was suspended, this unsubstantiated allegation is insufficient to establish but for causation. Notably, neither the union steward nor Fitzpatrick's supervisor who were present for the meeting recall Bibb making any such remarks. (Statement of Steven Jackson, filed as **Exhibit 35,** Wycoff Statement, ¶¶ 6-8, Ex. 22). Nevertheless, the Eleventh Circuit has made clear only "the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of some impermissible factor" constitute direct evidence of discrimination. *Rojas v. Florida*, 285 F.3d 1339, 1342 n.2 (11th Cir. 2002). "Evidence that is subject to more than one interpretation does not constitute direct evidence." *Marria v. C.R. England, Inc.*, 679 F. App'x 844, 848 (11th Cir. 2017). For example, in *Marria*, the decisionmaker wrote an email about the plaintiff's misconduct and the decision whether to terminate him in which the decisionmaker ended the email with the following comment referring to the plaintiff's EEOC Charge: "He has also filed a suit against me and CRE." *Id.* at 847. The plaintiff was terminated later that same day. The Eleventh Circuit held this comment was not direct evidence of discrimination because it was subject to interpretation and could be "construed as a natural and understandable factual reference to Marria's EEOC Intake Questionnaire when discussing Marria's background and contemplated termination." *Id.* at 848. Fitzpatrick alleged the termination meeting with Bibb, Morgan, and the union steward lasted 20

In addition, Fitzpatrick filed her most recent Charge before her termination on August 16, 2018. Koch Foods terminated Fitzpatrick on February 6, 2019 - almost six (6) months later. The substantial delay between Fitzpatrick's most recent Charge and her termination negates any finding of causation.

### 2. The EEOC determined there was insufficient evidence of retaliation.

The Eleventh Circuit Court of Appeals considers EEOC determinations to be "highly probative." *Barfield v. Orange County*, 911 F.2d 644, 650-51(11th Cir. 1990)(citing *Smith v. Universal Servs. Inc*., 454 F.2d 154 (5th Cir. 1972); *Calhoun v. McHugh*, 2 F.Supp.3d 1217, 1227 (N.D. Ala. 2014)(holding "administrative findings assessing claims of employment discrimination are admissible"). Importantly, the Eleventh Circuit has affirmed the admission of the EEOC's no cause determination in favor of the employer as proper evidence to refute an employee's discrimination claims at trial. *Barfield*, 911 F.2d at 651. Moreover, federal courts have held EEOC determinations are persuasive summary judgment evidence. *Radcliff v. Wal-Mart Stores, Inc.*, No. 3:00-CV-2774-P, 2002 WL

---

minutes, and that Bibb asked for Fitzpatrick to provide her version of events. (Fitzpatrick Depo. 197:18-199:24). Fitzpatrick alleges that during the meeting Bibb made the comment "ever since [you] filed a lawsuit with the EEOC, [you've] been complaining a lot." (*Id*. at 197:18-22). Even if there was evidence Bibb made such a remark other than Fitzpatrick's unsubstantiated, self-serving testimony, the comment, like the one in *Marria*, is subject to interpretation and could be construed as a factual reference to Fitzpatrick's problems with her co-workers since the filing of her EEOC Charges. Indeed, it could also have been a reference to McCaskey's statement that Fitzpatrick told McCaskey that HR would not do anything to her (Fitzpatrick) because of her lawsuit.

1042116, at *1 (N.D. Tex. May 21, 2002); *Bynum v. Fort Worth Indep. Sch. Dist.*, 41 F.Supp.2d 641, 656-57 (N.D. Tex. 1999) (holding EEOC reports are admissible for the purpose of deciding a motion for summary judgment); *Sanders v. Sybra, Inc.*, No. Civ. A. 3:00-CV-2559-D, 2002 WL 220062, *1 n. 4 (N.D. Tex. Feb. 11, 2002) (same).

The EEOC dismissed all of Fitzpatrick's EEOC's Charges for lack of sufficient evidence. In particular, as to her fourth Charge alleging retaliatory termination, the EEOC investigator determined Fitzpatrick had not provided any information to refute Koch Foods' claim that she was terminated for violation of its rules of conduct. Likewise, Fitzpatrick has failed to put forth evidence in this case to rebut that her terminated was for reported misconduct. The EEOC's determinations are additional, persuasive evidence regarding the lack of retaliatory intent.

### 3.   Fitzpatrick cannot show Koch Foods' reasons are pretextual.

Even if Fitzpatrick could establish a *prima facie* case of retaliation, which she cannot, she then must prove Koch Foods' legitimate, non-discriminatory reason was a mere pretext. Fitzpatrick must demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the proffered reasons for the employment action such that "a reasonable fact finder could find them unworthy of credence." *Cooper v. Southern Co.*, 390 F. 3d 695, 725 (11th Cir. 2004) (quotation

marks omitted). Pretext is not established by "adjudging whether employment decisions are prudent or fair. Instead, [the] sole concern is whether unlawful discriminatory animus motivates a challenged employment decision." *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F. 3d 1354, 1362 (11th Cir. 1999). Thus, the inquiry into whether an employer's proffered reasons amounted to a pretext for discrimination centers on the employer's belief, not the beliefs of the employee, or even objective reality. *Alvarez v. Royal Atlantic Developers, Inc.*, 610 F. 3d 1253, 1266 (11th Cir. 2010).

Fitzpatrick's termination was a result of Fitzpatrick's inappropriate behavior and violation of company policies. Even though Fitzpatrick denies she engaged in the misconduct, she does not dispute her co-workers reported that she called McCaskey derogatory and profane names and threatened her with violence. In addition, Fitzpatrick admits she left her work area without permission the following day to complain to HR personnel at a different plant. Fitzpatrick agrees that threating violence, cursing co-workers and job abandonment were policy violations that resulted in automatic termination. As such Koch Foods had a legitimate, non-discriminatory reason for any purported adverse actions. Fitzpatrick cannot show these reasons are a pretext for retaliation.

**B.** **Fitzpatrick's § 1981 Claim Fails As Matter of Law As There Is No Evidence She Made Race Discrimination Complaints.**

Summary judgment is due to be granted on Fitzpatrick's § 1981 retaliation claim for all of the same reasons addressed *infra* as Fitzpatrick's Title VII claim. In addition, Fitzpatrick's § 1981 claim is due to be dismissed for reasons set forth below concerning the lack of evidence of any complaint of racially discriminatory conduct.

**1.** **The complained-of conduct was based upon Fitzpatrick's national origin rather than her race.**

A claim under § 1981 requires evidence that but-for the plaintiff's race, which includes "ancestry or ethnic characteristics," the alleged injury would not have occurred. *Comcast Corp. v. National Association of African American Owned Media,* 140 S.C. 1009, 1019 (2020); *Saint Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 613 (1987). Section 1981 does not provide a cause of action for discrimination based "solely on the place or nation of [the plaintiff's] origin." *Nadesan v. Citizens Fin. Grp.*, 673 F. App'x 47, 49 (2d Cir. 2016); *Torgerson v. City of Rochester*, 643 F.3d 1031, 1053 (8th Cir. 2011) ("Section 1981 does not authorize discrimination claims based on national origin."); *Tippie v. Spacelabs Med., Inc.*, 180 F. App'x 51, 56 (11th Cir. 2006) ("By its very terms, § 1981 applies to claims of discrimination based on race, not national origin."); *Zar v. S.D. Bd. of Exam'rs of Psychologists,* 976 F.2d 459, 467 (8th Cir.1992) ("This claim of discrimination based upon national origin is insufficient to state a § 1981 claim."). In *Tippie*, the employee alleged that

she was discriminated against because she was not "a native of Latin America" as opposed to her race. *Tippie*, 180 Fed. Appx. at 56. The Eleventh Circuit affirmed dismissal of her § 1981 claim as it was "based on her national origin, not her race." *Id*; *Nadesan*, 673 Fed. App'x at 49 (affirming dismissal of employee's § 1981 claim as his complaint only asserted that he was treated differently because he was a "Singapore National," and did not allege facts that, if true, would establish that any different treatment was based on his race, ethnicity, or ancestry).

This Court denied Koch Foods' Motion to Dismiss Fitzpatrick's § 1981 claim on the basis that Fitzpatrick's alleged that her "supervisors stereotyped and ridiculed here as a voodoo practitioner because she is African" which this Court deemed sufficient to avoid dismissal. (Doc. 39 at p. 9). Fitzpatrick's testimony makes clear, however, the alleged derogatory comments were based upon her Jamaican national origin.  Fitzpatrick testified as follows:

Q.    Was it your belief that they were making the comments about the voodoo to you and calling you voodoo lady because you were from Jamaica?

A.    From Jamaica, yes.

Q.     I'm going to try to make this question not confusing. Were there any comments from anybody that people who live in Jamaica practice voodoo? Or was that just your assumption, that because they were making those comments to you and knew you were from --

A.    They said that people from Jamaica are voodoo workers, they work voodoo.

Q.    Who said that to you?

A.   The employee, the line lead, Wanda, Shainta Little.

Q.   They said that people from Jamaica practice voodoo?

A.    Yes.

Q.   When did Wanda make that comment to you?

A.   When I was working on her shift is when she started saying that I'm a voodoo worker.

Q.   And you said that. But did she say specifically something about Jamaica? Or did she just say you're a voodoo worker?

A.   She said I'm a voodoo worker. And then other people go on to say that people from Jamaica work voodoo.

********

Q.   So you were offended by it because you felt like it was negative towards your Jamaican culture?

A.   And towards me, too.

(Fitzpatrick Depo. 54:21-55:25; 56:19-22).

Fitzpatrick was offended by the alleged comments because she is "Jamaican" and "from a different culture." (Id. at 57:9-22)  Thus, just like the plaintiffs in *Tippie* and *Nadesan*, the conduct about which Fitzpatrick complains was based upon her national origin rather than her race.

> **2.    There is no evidence anyone involved in Fitzpatrick's termination was aware of her complaining about race discrimination.**

 "'A complaint about an employment practice constitutes protected opposition only if the individual explicitly or implicitly communicates a belief that the practice constitutes unlawful employment discrimination.'" *Murphy v. City of Aventura*, 383

F. App'x 915, 918 (11th Cir. 2010)(quoting EEOC Compl. Man. (CCH) §§ 8–II–B(2) (2006); *Demers v. Adams Homes, Inc*., 321 F. App'x 847, 852 (11th Cir. 2009) (internal quotes omitted) (holding that, to establish a retaliation claim, "the employee must still, at the very least, communicate her belief that discrimination is occurring to the employer, and cannot rely on the employer to infer that discrimination has occurred); *see also Jeronimus v. Polk County Opportunity Council, Inc*., 145 F. App'x 319, 326 (11th Cir. 2005) (a complaint "of being 'singled out,' being subjected to 'a campaign of harassment,' and working in a 'hostile environment' ... did not amount to protected conduct" where it "never suggested that this treatment was in any way related to [the plaintiff's] race or sex"). "Simply complaining that one feels 'picked on' will not suffice." *Bailey v. DAS N. Am., Inc*., 473 F. Supp. 3d 1310, 1332 (M.D. Ala. 2020).

According to Fitzpatrick, she only complained about one alleged voodoo comment to an unidentified HR clerk sometime in 2017 near the beginning of her employment. (Fitzpatrick Depo. 29:12-33:8; 40:2-41:15). However, there is no evidence that any decisionmaker was aware of this purported complaint. (Bibb Depo., 69:3-9). Fitzpatrick's other complaints were that she was being "bullied" and threatened. (*Id*.;7/24/18 Fitzpatrick Statement, Ex. 17; 8/16/18 Fitzpatrick Statement, Ex. 20; 1/28/19 Fitzpatrick Statements, Ex. 24). There was nothing in

Fitzpatrick's complaints to HR that put any decisionmaker on notice that she was complaining about race discrimination.

To the extent Fitzpatrick relies on her EEOC Charges to show she complained of race discrimination, her § 1981 claim fares no better. Fitzpatrick's first EEOC Charge filed in December of 2017 alleges a co-worker told management that she practiced voodoo and that she was being discriminated against because of her national origin. (12/21/17 EEOC Charge, Ex. 11). The box for race is not checked and there is no allegation of race discrimination. Fitzpatrick's second and third EEOC Charges do mention anything about voodoo. (5/7/18 EEOC Charge, Ex.16; 8/16/18 EEOC Charge, Ex. 21). They have no allegations of race discrimination. The only boxes checked are for national origin discrimination and retaliation. Even assuming Bibb had knowledge of the content of all Fitzpatrick's EEOC Charges, which she did not, they did not a communicate any purported belief of Fitzpatrick that she was a victim of race discrimination.

## V.    CONCLUSION.

Fitzpatrick received warnings about her violation of Koch Foods' Rules of Conduct. Despite having been suspended in August of 2018 for unruly behavior, Fitzpatrick provoked a fight with a co-worker in which she called the co-worker offensive names and threatened to beat her up. Regardless of whether Fitzpatrick denies she engaged in the misconduct, it is undisputed her fellow employees reported

that she cursed at her co-worker and threatened violence. Moreover, Fitzpatrick admits she left her work area without permission – which she admits was grounds for automatic termination. The overwhelming evidence establishes Koch Foods terminated Fitzpatrick's employment for these legitimate, nonretaliatory reasons. Fitzpatrick cannot produce substantial evidence that any EEOC Charge or internal complaint was the but for reason for her termination or refute Koch Foods legitimate, nonretaliatory reasons. Thus, summary judgment in Koch Foods' favor is due to be granted.

*s/ Rachel V. Barlotta*
RACHEL V. BARLOTTA
KATELYN DODD
Attorneys for Defendant
Koch Foods of Alabama, LLC

OF COUNSEL:
BAKER, DONELSON, BEARMAN,
 CALDWELL & BERKOWITZ, PC
Shipt Tower
420 North 20th Street, Suite 1400
Birmingham, AL  35203
(205)328-0480 Telephone
(205)322-8007 Facsimile

## Certificate of Service

I certify that the foregoing has been served upon the following parties and counsel of record by email, electronic filing, or by depositing a copy thereof in the United States mail, properly addressed and postage-prepaid, this February 22, 2023:

Lee Winston
WINSTON COOKS, LLC
505 20th Street North
Birmingham, Alabama 35203

s/Rachel V. Barlotta
Of Counsel