IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| MONOLESA FITZPATRICK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CASE NO. 2:19-cv-553-JTA |
| v. | ) | |
| | ) | (WO) |
| KOCH FOODS OF ALABAMA, LLC | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

### I.   INTRODUCTION

On August 1, 2019, Plaintiff Monolesa Fitzpatrick filed this action against her former employer, Defendant Koch Foods of Alabama, LLC. (Doc. No. 1.) Plaintiff alleges that, in violation of 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq*. ("Title VII"), Defendant retaliated against her for complaining of race discrimination.

The parties have consented to the exercise of dispositive jurisdiction by a magistrate judge pursuant to 28 U.S.C. § 636(c). (Docs. No. 19, 20.) Before the Court is Defendant's motion for summary judgment. (Doc. No. 50.) For the reasons stated below, Defendant's motion for summary judgment is due to be GRANTED IN PART as to Plaintiff's § 1981 claim and DENIED IN PART as to Plaintiff's Title VII claim.

### II.   JURISDICTION AND VENUE

This Court exercises subject matter jurisdiction over Plaintiff's Title VII and § 1981 claims pursuant to 28 U.S.C. § 1331. The parties do not contest personal jurisdiction or

venue, and the Court finds sufficient allegations to support both in the Middle District of Alabama.

### III.   STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Palm v. U.S.*, 904 F. Supp. 1312, 1314 (M.D. Ala. 1995) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions of file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing, or pointing out to, the district court that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id.* at 322-324. A factual dispute is genuine if the evidence would allow a reasonable jury to find for the nonmoving party. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).

Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324. To avoid summary judgment, the

nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." *Matsushita v. Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 (1986). On the other hand, the evidence of the nonmovant must be believed and all justifiable inferences must be drawn in its favor. *See Anderson*, 477 U.S. at 255. After the nonmoving party has responded to the motion for summary judgment, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(e). As stated by the Court in *Celotex*, if the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to [his] case, and on which [he] will bear the burden of proof at trial," the moving party is entitled to summary judgment. *Celotex*, 477 U.S. at 322.

## IV.    FACTS[1]

In Montgomery, Alabama, Defendant has two plants at the same facility: a processing plant for slaughtering chickens, and a debone plant where the bones are removed from the slaughtered chickens' carcasses and the carcasses are separated and packaged for consumers. (Doc. No. 52-1 at 5.)

Defendant has a written policy prohibiting race or national origin discrimination, and it has procedures for reporting discrimination. (Doc. No. 52-2.) Plaintiff received a copy of Defendant's antidiscrimination policy around the time she began work at

---

[1] Where evidence conflicts, the facts are set forth here in the light most favorable to the nonmoving party. *Sears v. Roberts*, 922 F.3d 1199, 1209 (11th Cir. 2019).

Defendant's debone plant on January 24, 2017, when she began work as a tender puller (also known as a "tender clipper"). (Doc. No. 52-3 at 7-8; Doc. No. 52-4; Doc. No. 52-5.)

Plaintiff began work on the night shift. (Doc. No. 52-3 at 8, 10.) About three weeks after Plaintiff began work as a tender puller, her co-workers learned that she was Jamaican, and they began to treat her differently. (*Id*. at 8.) When Plaintiff asked for permission to sharpen her knife or to use the restroom, the line lead would tell Plaintiff not to talk because she "hated the sound of her voice." (*Id*. at 8-9.) The line lead also accused Plaintiff of being a "voodoo lady" and of "being a witch" who "work[ed] voodoo." (*Id*. at 9.) This left Plaintiff in tears. (*Id*. at 9-10.) This treatment occurred "over and over," and other employees began to think that Plaintiff "was a voodoo lady for real." (*Id*. at 10.) Employees began to ask Plaintiff if she practiced voodoo, and, at one point, a line lead told another employee not to look in Plaintiff's face lest she die, so the employee held her head down. (*Id.* at 13.) Plaintiff complained repeatedly to Defendant's Human Resources ("HR") Department, which informed her that Defendant did not condone bullying and eventually reassigned her to the day shift at her request. (*Id*. at 10, 12.)

On Plaintiff's new shift, her new supervisors were Shainta Little and Davis Vernon. (*Id.* at 15.) Little would deny Plaintiff restroom breaks, but would allow others restroom breaks when they requested them. (*Id*. at 15, 19.) Vernon told Plaintiff that Little had accused Plaintiff of putting a voodoo curse on her.  (*Id*. at 15-16.) Eventually, because of rumors, the majority of people on Plaintiff's shift assumed Plaintiff was a voodoo worker who made people sick. (*Id*. at 16-17.) Plaintiff understood that, because she was from

Jamaica, people were accusing her of being a witch and a voodoo worker who made other employees sick. (*Id*.)

Occasionally, Plaintiff would work as a tender scorer, which has a higher pay than tender puller, until, on November 14, 2017, she was permanently promoted to tender scorer. (Doc. No. 52-8.) Even as a tender scorer, however, Plaintiff was still required to rotate positions on the chicken processing line as part of Defendant's Occupational Safety and Health Administration practices to prevent wear and tear on employees from performing repetitive motions. (Little Statement, Doc. No. 52-4 at ¶ 6.)

Line leaders were allowed to give employees permission to stand in for each other so that one could use the restroom. (Doc. No. 52-4 at ¶ 3.) On December 7, 2017, someone[2] asked Plaintiff to stand in for another employee on the line so that the other employee could use the restroom. (Doc. No. 52-4 at ¶ 5; Doc. No. 52-11.) Plaintiff refused because she had previously been written up for getting another employee to stand in for her so that she could use the restroom without supervisor permission, so instead Plaintiff told the employee to get the supervisor's permission. (Doc. No. 52-3 at 24.) The employee who needed to use the restroom could not leave the line without someone to take their place, and they eventually used the restroom on themself. (Doc. No. 52-4 at ¶ 5.) Therefore, the line supervisor, Little, escorted Plaintiff to the HR office, after which Defendant decided to suspend Plaintiff. (*Id*.) However, because it was later determined that Plaintiff was not

---

[2] The parties cite no evidence that a line leader or other supervisor asked Plaintiff to stand in for the employee who needed to use the restroom.

required to relieve her coworker, Defendant voided the suspension and paid Plaintiff for the days during which she had been suspended. (*Id.*)

On December 21, 2017, Plaintiff submitted a Charge of Discrimination to the Equal Employment Opportunity Commission ("EEOC"), stating:

> I am a person of Jamaican descent. I was hired as a Production Worker in January 2017. A co[-]worker informed management that I practiced voodoo and since then the terms and condition of my employment changed. I was suspended on December 7, 2017, after I was asked to relieve a co[-]worker who needed to use the restroom. I advised the co[-]worker to get permission from a Team Leader as I had been advised. As a result of this incident I was suspended for three days. Prior to this incident and upon return, when I ask for relief I am ignored. I was even assaulted by my team lead without any action being taken. I have asked for assistance from managerial personnel but my requests have gone unanswered.
>
> I believe that I am being discriminated against because of my national origin, Jamaican, in violation of Title VII of the Civil Rights Act of 1964, as amended.

(Doc. No. 52-11.)

On February 14, 2018, a little over one year after beginning work for Defendant, Plaintiff signed Defendant's conduct policy, indicating that she had read and understood the policy. (Doc. No. 52-6.) The conduct policy stated as follows:

RULES OF CONDUCT-TYPE I

VIOLATIONS OF THE FOLLOWING RULES WILL BE GROUNDS FOR ***IMMEDIATE TERMINATION*** (EVEN ON THE FIRST OFFENSE)

….

8.   Creating a hostile work environment or otherwise violating [Defendant's] anti-harassment and anti-discrimination policy.

9.   Willful refusal to follow reasonable instructions or directions of a supervisor or manager.

10.   Intentional or reckless acts, including horseplay or practical jokes, which endanger employees.

….

14.   Job abandonment: unauthorized departure from a work shift; leaving the Company premises without notifying the supervisor or without permission; or leaving an assigned work area or work station during working hours without supervisory permission (employees must notify [their] supervisor and get permission to leave a shift).

15.   Fighting or provoking a fight (DO NOT PLACE HANDS ON OTHER PEOPLE OR USE PROVOKING LANGUAGE).

…

21.   Cursing co-workers, supervisors, management, visitors, vendors, or customers.

22.   Threats of violence or terrorism toward anyone.

RULES OF CONDUCT – TYPE II

VIOLATION OF TYPE II RULES GENERALLY WILL FOLLOW PROGRESSIVE DISCIPLINARY STEPS UP TO AND INCLUDING TERMINATION. In certain cases depending on the severity of the infraction, the Company may not follow the steps as outlined and may proceed to the termination step.

…

3.   Taking more time than allowed for breaks, lunches, restroom breaks, late to the line.

4.   Displaying harassing or discriminating behavior.

…

10.   Uncivil attitudes and loud or offensive language and/or behavior.

(Doc. No. 52-6 at 2-3 (emphasis in original)).

According to the line leader of Plaintiff's shift, Tiekya Needham, on February 8, 2018, Needham asked Plaintiff to work as a tender puller and she refused, saying that pulling tenders was not in her job description. (Doc. No. 52-12.) Needham submitted a statement regarding the incident to Defendant's HR Department in which she alleged that she "ask[ed] [Plaintiff] to pull tenders," but Plaintiff threatened to "walk off the line" and "go home." (Doc. No. 52-12 at 5.)

On February 9, 2018, Plaintiff submitted to Defendant a statement of the incident stating that, when Needham "told [her] to pull tender[s]," she told Needham that she was a tender scorer and would score tenders. (Doc. No. 52-14 at 2.) Needham then went and reported the incident to the supervisor, Shainta Little, who told Plaintiff to tender score and also to spit out her gum, which was not allowed on the line for sanitary reasons. (*Id.*) Plaintiff spat out her gum. (*Id.*) According to Plaintiff, she then went to go pull tenders. (*Id.*) However, Little submitted a February 9, 2018 Employee Warning Report to Defendant in which she stated that Plaintiff continued to say that she was not going to work as a tender puller. (Doc. No. 52-15.) Little told Plaintiff to go to HR, where she was informed she would be suspended. (*Id.*; Doc. No. 52-14 at 2.)

On May 7, 2018, Plaintiff filed a second EEOC charge in which she alleged that Little ignored her requests to use the restroom in retaliation for her earlier EEOC charge and that, as a result of being denied a bathroom break for an hour, she used the restroom on herself. (Doc. No. 52-16.)

On July 24, 2018, Vernon, Plaintiff's supervisor at that time, while inspecting for earrings, pulled Plaintiff's hair net away from her head, removed her hearing protector plugs, and touched her ears. (Doc. No. 52-3 at 27.) Plaintiff submitted a written complaint to Defendant's Human Resources Department, claiming that she felt "very violated" by being touched in the process of having her ears checked. (Doc. No. 52-17.) She also filed a police report about the incident. (Doc. No. 52-18.)

On August 16, 2018, Vernon signed an Employee Warning Report stating that Plaintiff had "bec[o]me very unruly with the team lead in regards to working on the line" that had been assigned to her, and that Plaintiff's behavior was "causing mass disruption." (Doc. No. 52-19.) Vernon stated that "when [he] approached the area, [Plaintiff] was arguing with the team lead and not performing her work." (*Id*.) On the same day, Plaintiff also submitted a statement to Defendant, in which she stated the following:

> On August 16, 2018 at 8:25 when I told my … supervisor Davis Vernon come to me and I told him that my hand hurt and I can[']t pull the breast done. [H]e told me to go to line six and pull tender of he came and got me and sent me on line four[] (4) there was someone already there pulling breast. The line lead take her down and put me there as I was there I could not pull the breast down as I told the line lead and my hands hurt and he should let me do the table whic[h] would be less pressure on my [w]ris[t]. [H]e said do breast I said it unfair my hands hurt. I have refuse medical atten[t]ion over and over on several occasion…. My supervisor did not let me see the nurse. [A]ll he did was stand behind me and I felt streaten and intimidated by him because he always be picking on me.

(Doc. No. 52-20 at 2-3 (sic).)

Plaintiff was suspended pending the investigation of the alleged August 16, 2018, disruption of the line. (*Id*.)

On August 17, 2018, Plaintiff filed a third Charge of Discrimination with the EEOC, this time alleging the following:

> I am a former employee of the above-named employer, who engaged in a protected activity (EEOC Charge No. 420-2018-00733) in December 2017. After I filed my charge of discrimination, my supervisor began to start harassing me by standing behind me and whistling. I complained to human resources, but nothing was done.
>
> On another occasion, my supervisor accused me of wearing earrings on the line. The supervisor then physically touched my head and ears to inspect if I was wearing earrings. I filed a police report about the incident. On August 16, 2018, I told supervisor my hand hurt and he moved me to another line to work. I told him my hand still hurt and that I needed medical attention. He told me I was being argumentative, and had security escort me off the premises.
>
> I believe that I was harassed and discharged because of my national origin and in retaliation for filing an EEOC charge of discrimination, in violation of Title VII of the Civil Rights Ct of 1964, as amended.

(Doc. No. 52-21 (sic).)

In her deposition, when asked about when she was first subjected to discriminatory comments, Plaintiff stated: "When [Wanda, the line lead] found out I was Jamaican. To be honest, when she found out I was Jamaican, then that's when everything starts." (Doc. No. 52-3 at 8.) Plaintiff testified that "[Wanda] said I'm a witch and I work voodoo …. She said it whenever I'm at work…. I don't know why she would say that. Maybe because I'm from Jamaica. She said that I'm a voodoo lady." (*Id*. at 9.)

In Plaintiff's deposition, when asked about comments from the other employees accusing her of voodoo and of injuring her fellow employees by witchcraft, Plaintiff testified that "[t]hey [certain other employees] said that people from Jamaica are voodoo workers, they work voodoo…. [Wanda] said I'm a voodoo worker. And then other people

go on to say that people from Jamaica work voodoo." (*Id*. at 16.) When asked if "it [was her] belief that they were making comments about the voodoo to [her] and calling [her] voodoo lady because [she was] from Jamaica," Plaintiff responded, "From Jamaica, yes, ma'am." (*Id*.) Plaintiff explained that such comments were "offensive to me because I'm Jamaican and I'm from a different culture. So I think they do that because I'm from a different culture and a different country, why they do that." (*Id*. at 17.)

When asked at her deposition why Little was allegedly trying to get Plaintiff fired, Plaintiff stated: "I don't know. Maybe because the whole --- that I'm from a different country and I'm Jamaican." (*Id*. at 23.) When asked whether she contended that Vernon checked her for earrings because she was from Jamaica, Plaintiff responded, "[y]es." When asked whether she thought there were any other reasons why Vernon checked her ears for earrings, Plaintiff responded, "[n]o, Ma'am." (*Id*. at 27.)

In January 2019, Constance Wyckoff Morgan was Plaintiff's line supervisor. (Doc. No. 52-22.) On January 28, 2019, Plaintiff was working at her station, and another employee, Ms. Henry, accused Plaintiff of being a witch, told her she should go back to Jamaica, and suggested that "Donald Trump should send your ass back." (Doc. No. 52-3 at 45.) Henry informed Plaintiff that "'[t]hey should send you back to Jamaica where you're from with your voodoo." (*Id*.) She further elaborated: "I will whoop your ass. And when I'm done with you, you can go put your little voodoo on me." (*Id*.) Then, an employee

named Tanya McCaskey deliberately sprayed Plaintiff with a hose by pointing the hose at Plaintiff's face and then spraying her, and "everyone" laughed at Plaintiff.[3] (*Id.* at 44-45.)

The line stopped, and Morgan went to investigate the cause. (*Id.*) She discovered that a dispute had arisen because, according to Plaintiff, McCaskey had sprayed Plaintiff with the water hose. (*Id.*) McCaskey denied spraying Plaintiff, and, according to Morgan, Plaintiff then called McCaskey a "'f—ing whore'" who was "selling her body 'like a prostitute.'" (*Id.*)

Morgan took the feuding employees to HR for investigation and resolution of the issue, where Plaintiff gave two written statements about the incident. (*Id.*) One of Plaintiff's statements was as follows:

> Tania [k]eep threaten me. I don[']t know what and why. Jan 28, 19 I was scoring tender on line when she use the hose and wet me[.] I told my supervisor and that I am going to make a complaint to HR and I went back to the line where she said she wet me and what can I do about it. She keep threatening [m]e and I am fair for my life. I am been threaten too many time.

(Doc. No. 52-24 at 2-3 (sic).)

---

[3] During the investigation into the incident McCaskey denied spraying Plaintiff with a hose. On summary judgment, factual disputes are resolved in favor of the nonmoving party, and the court does not make credibility determinations. *Anderson*, 477 U.S. at 255; *Sears*, 922 F.3d at 1209 ("The district court erred by weighing the evidence and making its own credibility determinations at the summary judgment stage."); *Miller v. Harget*, 458 F.3d 1251, 1256 (11th Cir. 2006). Therefore, for purposes of ruling on the motion summary judgment, where witness's accounts differ or evidence conflicts, the court takes Plaintiff's account as true. *Anderson*, 477 U.S. at 255 (holding that, on summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor"). Conflicting accounts are set out here to the extent that they are relevant to the issues on summary judgment, such to establish the fact that Defendant investigated and obtained witness statements.

Plaintiff's other statement, also made on January 28, 2019, and submitted to

Defendant, was as follows:

> I am been threaten and bullied everyday, I came to work by Nicole Henry and Tania for no reason.
>
> I believe that my job and my life is at risk and danger, I keep[]coming to HR on several occasion and you all not doing Anything to fix the problem or the situation.
>
> I am scared because I do not have anyone to talk because when I tr[i]ed telling HR about the constan[t] bullying and threat[s] you don't do anything about it.

(Doc. No. 52-24 at 4-5 (sic).)

Likewise, on January 28, 2019, McCaskey also submitted a written statement to

Defendant's HR Department. McCaskey stated:

> Today this lady Monalisa said I wet her up and I didn't do it. I have two witness saying I didn't spray her. She came back on line 5 point her finger in my face call me all kind of bitches, whore old dog. [A]nd I put my foot down and said that we to old for this I not going to do this I have 4 witness prove that she was goin to beat my ass and call me all kind of bitches and whore, Kalmetrice, Jenifer, Emma, Courtnay.
>
> I talk to Steve and we going to have a meeting about this because she thinks in good to call me bitches and whore she said that H[R] will not do anything to her because of he law suit.

(Doc. No. 52-23 (sic).)

Plaintiff, however, denies cursing or threatening McCaskey, and denies that the

other witness's statements were true. (Doc. No. 52-3 at 45.) Plaintiff stated in her

deposition:

> None of these statements is true. Because I am the one who got hosed down. And if she's cleaning the floor, why would the water wet my face? Why

would I have been wet from my head to my feet if she was cleaning the floor? You have to be on a ladder like this high.

(*Id*. at 46.)

Shawnta Bibb (also known as "Nikki Bibb"), the HR Manager at the site, investigated the incident, including obtaining statements from the witnesses. (Doc. No. 52-25.) One witness, Kalmetrice Kemp, provided the following written statement on January 28, 2019:

> "I was On line 5 when I saw [Plaintiff] and Tanya. [Plaintiff] stated "she sprayed me with water." [Plaintiff] called Tanya a "Freaky bitch." She said "You[']re a whore!" She also stated that "if she catch her in Walmart again she's going to beat her ass!!"

(Doc. No. 52-26 (sic).)

On the same day, January 28, 2019, Courtney Brown provided the following written witness statement:

> I was on the line working and [Plaintiff] got off the line and said Toya had splashed water on her. So [Plaintiff] stopped the line and said she was going to [H]R about what had happened. So when [Plaintiff] came back on the line she was cussing Toya out saying when she see her outside of work she was going to beat her and drag her. [Plaintiff] was the only one cussing cause [T]oya was quiet the whole time. So by that time that[']s when they both was called to [H]R to see what had happened.

(Doc. No. 52-57 (sic).)

Jenifer Howard's January 28, 2019 written witness statement was as follows:

> While on the line [Plaintiff] said Tanya sprayed water on her. I didn't see her spray her with water because Tanya was spraying under the machine. After [Plaintiff] walk off the line and came back Tanya was standing there talking to [C]onstance and [Plaintiff] addressed Tanya and told her that if she catch her outside the job what she was gonna do. After that they both were going back and forth.

(Doc. No. 52-28.)

The following day, Plaintiff asked Morgan if she could leave her place on the line to go to HR, but Morgan denied the request. (Doc. No. 52-22.) Sometime thereafter, Bibb asked Morgan to send Plaintiff to her office in the HR Department. (Doc. No. 52-22, Doc. No. Doc. No. 52-1 at 3.) Morgan could not find Plaintiff because Plaintiff had already left the line to go to the HR office. (Doc. No. 52-22.) At some point later that day, Bibb met with Plaintiff and others about the incident, after which Plaintiff was suspended pending the HR investigation for violating company policy. (Doc. No. 52-25.) Bibb concluded that the violations at issue were the following Type I violations: job abandonment, making false or malicious statements to harm the reputation of Defendant or an employee, cursing coworkers, and threats of violence toward another. (Doc. No. 52-25 at 3-4.)

Plaintiff was subsequently terminated.[4] McCaskey was not disciplined for her role in the incident. (Doc. No. 51-1 at 25.)

---

[4] Defendant asserts in its brief that Bibb terminated Plaintiff's employment after finding that she had violated the following Type I rules: making threats of violence, fighting or provoking a fight, cursing coworkers, and job abandonment. (Doc. No. 51 at 11.) Defendant does not cite the record to support this assertion. (*Id.*) Bibb's investigation notes, which Defendant did not cite in support of its assertion regarding the reasons for the termination, do not indicate that Plaintiff was under investigation for fighting or provoking a fight. (Doc. No. 52-25 at 3-4.) Defendant bears the burden of presenting and citing evidence to support its motion for summary judgment. Fed. R. Civ. P. 56(c)(1)(A) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by … citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials.")); Fed. R. Civ. P. 56(c)(3) ("Materials Not Cited. The court need consider only the cited materials, but it may consider other materials in the record.").

In her deposition, Plaintiff testified as follows regarding Bibb's stated reasons for terminating[5] her employment:

- "[Bibb's] statement was, 'Since you filed a lawsuit or EEO charges against [Defendant], you have been complaining a lot. Hand over your badge. You're fired.'" (Doc. No. 52-3 at 26.)

- "So they point me to [Bibb's] office. And me and the union rep, Mr. Steve, went to the HR office to speak with [Bibb]. And that's what she told me that ever since I filed a lawsuit or an EEOC charge against [Defendant], I've been complaining a lot, so I'm terminated." (*Id*. at 47.)

- "[Bibb's] exact words was because I filed a lawsuit, an EEOC charge against [Defendant]. I don't know of any other reasons. That's what she said to me." (*Id*. at 52.)

- "Mr. Steve was mostly doing the talking, trying to get [Bibb] to let me keep the job. But she said I complained too much ever since I filed a lawsuit. And I told her I didn't – I never filed a lawsuit against [Defendant]. And she said she have to let me go because I'm complaining a lot since then." (*Id*.)

- "Bibb told me I was fired. The first meeting, she said – her exact words, 'Ever since you filed a lawsuit with the EEOC against [Defendant], you've been complaining a

---

[5] From the materials submitted to the Court on summary judgment, it appears that the statements Bibb allegedly made regarding the reason for Plaintiff's termination were likely made at the time Plaintiff was suspended pending investigation. However, Defendant does not raise this point in a substantive argument in its brief; nor does Defendant argue that the timing of Bibb's alleged statement injects ambiguity into the statement.

lot. So hand over your badge.'" And she got the security to escort me. And she said,

'You're fired.' And she took my badge, and they escort me out the door." (*Id.* at

53.)

On February 11, 2019, Plaintiff filed a fourth Charge of Discrimination with the

EEOC, stating:

> I believe that I have been discriminated because I filed a previous charge
> (420-2018-01539).
>
> Around September 25, 2018[,] I needed to use the restroom so I asked my
> line supervisor (Mimi) and she ignored me. I tried to ask another supervisor
> that I saw walking by (Shante Little) and she waved me off. I saw the head
> supervisor (Franco) so I asked him and he told me to wait until they stopped
> running the birds. Twenty minutes after the birds stop running I asked Franco
> again and he ignored me. I went to the restroom and when I returned the line
> was shutdown. Everyone was working on another line, so I went to join them.
> Then Franco tapped me on my shoulder and told me to leave. I went to HR
> and told them that Franco sent me home so that they wouldn't get me for job
> abandonment or point infraction and they said ok.
>
> On January 28, 2019, one of my coworkers (Tanya Gibbs) hosed me down
> with a water hose. I complained to HR and nothing was done. I want back to
> HR and they gave me a complaint form to fill out. Tanya Gibbs threaten to
> beat me up and I went to back to report it to HR and they told me that I cannot
> make a complaint on the same person twice.
>
> On January 29, 2019, Tanya Gibbs and Teresa LNU was talking about
> beating me up while standing right behind me. I reported it to HR and they
> did not do anything about it. I went to HR in the kill department and they told
> me they could not do anything, because it was not their department, so they
> recommended me to the HR Manager. I went to the HR Manager (Nikki
> Bibb) along with the union rep (Steve) and my supervisor (Constance
> Morgan). Nikki told me that ever since I filed a lawsuit with the EEOC I have
> been complaining a lot. I told her I don't know who else to complain to and
> she told me she was going to let me go and took my badge.
>
> I believe that I have been retaliated against for filing a charge with the EEOC
> in violation of Title VII of the Civil Rights Act of 1964, as amended.

17

(Doc. No. 56-2 at 6-7 (sic).)

## V.   PROCEDURAL HISTORY

On December 14, 2018, the EEOC issued Plaintiff a Notice of Right to Sue with respect to the EEOC charge she filed on August 17, 2018. (Doc. No. 52-30.) On May 1, 2019, the EEOC issued Plaintiff a Notice of Right to Sue with respect to her May 7, 2018 EEOC charge. (Doc. No. 52-16.) On May 2, 2019, the EEOC issued Plaintiff a Notice of Right to Sue with respect to her December 21, 2017 EEOC charge. (Doc. No. 52-32.)

On August 9, 2019, Plaintiff filed her Complaint in this action, asserting claims of national origin discrimination in violation of Title VII, retaliation in violation of Title VII, and retaliation in violation of 42 U.S.C. § 1981. (Doc. No. 1.) On November 5, 2019, Plaintiff filed a First Amended Complaint. (Doc. No. 17.) On July 20, 2021, Plaintiff filed a Second Amended Complaint, asserting one count of violation of Title VII by retaliation for opposing national origin discrimination, and one count of violation of § 1981 by retaliation for opposing race discrimination. (Doc. No. 34.)

On August 6, 2021, Defendant filed a Motion to Dismiss the § 1981 claim in the Second Amended Complaint. (Doc. No 35.) Defendant argued that voodoo is a religion and that Plaintiff was attempting to disguise a religious or national origin discrimination claim as one for race under § 1981. (*Id*.) After the motion came under submission, on February 14, 2002, the Court entered an Order denying the motion. (Doc. No. 39.) Specifically, the Court found that, though "the line between ethnicity and national origin is 'not a bright one,'" Plaintiff had sufficiently alleged a § 1981 retaliation claim pertaining her African race. (*Id*. at 9.)

On February 22, 2023, Defendant filed a Motion for Summary Judgment. (Doc. No. 50.) Plaintiff filed a response in opposition to the motion, and Defendant filed a brief in reply. (Docs. No. 55, 57.) The motion is now under submission and ripe for resolution.

## VI.    DISCUSSION

A.    Plaintiff's § 1981 Claim – Retaliation for Opposing Race Discrimination

Section 1981 prohibits racial discrimination in "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(a), (b).  "Although § 1981 does not itself use the word 'race,' the [Supreme] Court has construed the section to forbid all 'racial' discrimination in the making of private as well as public contracts." *Saint Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 609 (1987) (citation omitted).  Section 1981 thus creates a substantive statutory remedy for employment discrimination.  *See Johnson v. Ry. Express Agency, Inc.*, 421 U.S. 454, 459-60 (1975) ("§ 1981 affords a federal remedy against discrimination in private employment on the basis of race"); *Ferrill v. Parker Grp., Inc.*, 168 F.3d 468, 472 (11th Cir. 1999) ("Section 1981 prohibits intentional race discrimination in the making and enforcement of public and private contracts, including employment contracts.").  Though there is no mention of retaliation in the text of § 1981, the Supreme Court has held that § 1981 "encompasses claims of retaliation." *CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 457 (2008).  *See also Gogel v. Kia Motors Mfg. of Georgia, Inc.*, 967 F.3d 1121, 1134 (11th Cir. 2020) ("Retaliation claims are also cognizable under 42 U.S.C. § 1981.").

Generally, § 1981 is similar to, though independent from, Title VII.  So much so that "[t]he analytical framework and rules about employer liability under Title VII and § 1981 are the same."  *See Ash v. Tyson Foods, Inc*., 664 F.3d 883, 904 (11th Cir. 2011). Yet, unlike Title VII, § 1981 claims are limited to race discrimination.  *See Little v. United Technologies, Carrier Transicold Div*., 103 F.3d 956, 961 (11th Cir. 1997) ("It is well-established that § 1981 is concerned with racial discrimination in the making and enforcement of contracts." (emphasis in original)).  A claim for discrimination based solely on the plaintiff's place or nation of origin[6] is not actionable under § 1981.  *See Saint Francis Coll.*, 481 U.S. at 613; *Tippie v. Spacelabs Med., Inc.*, 180 F. App'x 51, 56 (11th Cir. 2006) ("By its very terms, § 1981 applies to claims of discrimination based on race, not national origin.").  However, the line between national origin and race discrimination is not always easily distinguishable. *Bullard v. OMI Georgia, Inc*., 640 F.2d 632, 634 (5th Cir. 1981).[7] The Supreme Court has held that, so long as a plaintiff can prove that she was subjected to intentional discrimination based on her race, ethnic characteristics, or ancestry, "rather than solely on the place or nation of [her] origin," she has an actionable claim under § 1981.  *Saint Francis Coll.*, 481 U.S. at 613.

---

[6] Plaintiff has not attempted to state or pursue a claim on grounds that Defendant violated § 1981 by retaliating against her for protesting discrimination based on lawful alien status, which is not the same as national origin discrimination.

[7] *See Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981).

Accordingly, in the Court's February 14, 2022 Memorandum Opinion and Order, the Court denied Defendant's motion to dismiss Plaintiff's § 1981 claims, finding that Plaintiff had sufficiently stated a race discrimination claim by alleging in her Complaint that she was "ridiculed as a voodoo practitioner because she is African." (Doc. No. 39 at 9.) The question now, at this stage of the proceedings, is not whether such an allegation *can* state a cause of action for race discrimination under § 1981, but whether the evidence on summary judgment (or inferences reasonably drawn therefrom) *supports* Plaintiff's allegation that she was ridiculed as a voodoo practitioner or otherwise subjected to discrimination because she is of African ancestral descent or ethnicity. Unfortunately for Plaintiff, the evidence on summary judgment does not support that allegation in this case.

In her brief, Plaintiff contends that her coworkers' accusations that she practiced voodoo were inherently based on her race because voodoo was brought to Jamaica from Africa. However, the evidence Plaintiff presents in this particular case does not bear out that contention.[8] According to Plaintiff's testimony, workplace discrimination began not upon her co-worker's discovery that she was of African descent or ethnicity, but upon their discovery that she was from Jamaica.[9] At every turn during Plaintiff's deposition, when asked why she was subjected to discrimination, including being ridiculed for and accused

---

[8] The Court expresses no opinion on whether accusations of practicing voodoo, without more, could ever constitute evidence of race discrimination. In this case, however, the record on summary judgment, including Plaintiff's testimony, exclusively indicates that the accusations of voodoo stemmed from national origin discrimination.

[9] In response to a question regarding when the discrimination began, Plaintiff responded: "When [Wanda, the line lead] found out I was Jamaican. To be honest, when she found out I was Jamaican, then that's when everything starts." (Doc. No. 52-3 at 8.)

of practicing voodoo, she stated her belief that the motivation for the discrimination was that she was from Jamaica and because of perceived cultural traits associated with her national origin as a Jamaican; she made no mention whatsoever of her African ethnic heritage/ancestry or her race/ethnicity as even a contributing factor to the alleged discrimination.[10] If evidence exists that Plaintiff was accused of practicing voodoo or otherwise subjected to discrimination due to anything other than her Jamaican national origin, Plaintiff has not presented it in her brief. Thus, in this case, Plaintiff has established only that she was accused of practicing voodoo "solely" because of "the place or nation of [her] origin," which is not enough to state a § 1981 claim. *Saint Francis Coll.*, 481 U.S. at 613.

In sum, because of the complete lack of evidence that accusations of voodoo (or any other discriminatory acts) were attributable to anything other than Plaintiff's national origin

---

[10] *See* Doc. No. 52-3 at 9 ("[Wanda] said I'm a witch and I work voodoo …. She said it whenever I'm at work…. I don't know why she would say that. Maybe because I'm from Jamaica. She said that I'm a voodoo lady."); *id*. at 16 ("They [certain other employees] said that people from Jamaica are voodoo workers, they work voodoo…. [Wanda] said I'm a voodoo worker. And then other people go on to say that people from Jamaica work voodoo."); *id.* (When asked if "it [was] your belief that they were making comments about the voodoo to you and calling you voodoo lady because you were from Jamaica," Plaintiff responded, "From Jamaica, yes, ma'am."); *id*. at 17 ("It's offensive to me because I'm Jamaican and I'm from a different culture. So I think they do that because I'm from a different culture and a different country, why they do that."); *id*. at 23 (Plaintiff's statement, in response to a question as to why Little was allegedly trying to get Plaintiff fired: "I don't know. Maybe because the whole --- that I'm from a different country and I'm Jamaican."); *id*. at 27 (when asked whether she contended that Vernon checked her for earrings because she was from Jamaica, Plaintiff stated: "Yes." When asked whether she thought there were any other reasons why Vernon checked her ears for earrings, she stated: "No, Ma'am."); *id*. at 45 (Plaintiff's testimony that an employee deliberately sprayed her with a hose immediately after another employee told Plaintiff that "'Donald Trump should send your ass back'" and "'[t]hey should send you back to Jamaica where you're from with your voodoo. I will whoop your ass. And then you can put your little voodoo on me.").

as a Jamaican, Plaintiff's § 1981 claim cannot survive summary judgment in this case.  *See Tippie*, 180 F. App'x at 56 ("The district court did not err in dismissing Tippie's § 1981 race discrimination claim because her only alleged evidence of discrimination was based on the fact that she is not a native of Latin America. This is a claim based on her national origin, not her race."). *See Saint Francis Coll.*, 481 U.S. at 613 ("*If [the plaintiff] … can prove* that he was subjected to intentional discrimination based on the fact that he was born an Arab, *rather than solely on the place or nation of his origin, or his religion*, he will have made out a case under § 1981." (emphasis added)); *Nnadozie v. Genesis HealthCare Corp*., 730 F. App'x 151, 159 (4th Cir. 2018) ("Ezeh's *evidence, if found credible by a factfinder, shows* that Zimmerman stereotyped her African employees as voodoo practitioners, which, *in conjunction with her other evidence*, provides a basis for finding discrimination based on ethnicity or ancestry, and, therefore, on race." (emphasis added)); *Vill. of Freeport v. Barrella*, 814 F.3d 594, 606 (2d Cir. 2016) ("[C]laims based on race and national origin may substantially overlap or even be indistinguishable *depending on the specific facts of a case*." (emphasis added; citation and internal quotation marks omitted)); *Reed v. Dep't of Veterans Affs*., No. 1:16-CV-142-MW-GRJ, 2018 WL 3018206, at *5 (N.D. Fla. May 18, 2018) (finding that the plaintiff stated a § 1981 claim based on allegations of "conduct that spanned a three-year period and that included referring to her as a 'monkey,' mocking her for her ethnic dialect, white coworkers treating her as though she were 'unclean'" because she was Black, "stereotyping Plaintiff as a practitioner of voodoo, and taunting Plaintiff because of her race and ethnicity with verbiage about hexes and voodoo dolls"), *report and recommendation adopted*, No. 1:16CV142-MW/GRJ, 2018 WL 3017322 (N.D. Fla. June

15, 2018); *Mandengue v. ADT Sec. Sys., Inc*., No. CIV.A. ELH-09-3103, 2012 WL 892621, at *28 (D. Md. Mar. 14, 2012) (finding sufficient evidence to support a § 1981 claim where a plaintiff from Cameroon presented evidence that she was subjected to discrimination on the basis of race, such as comments that a black woman could not succeed in the business, that she was "from the jungle," and accusations that she practiced voodoo).

Plaintiff argues that, even if she was not *actually* subjected to race-based discrimination, she can nevertheless prevail on summary judgment if she presents evidence that she was subjected to retaliation because she protested discrimination that she reasonably and in good faith *believed* was directed at her because of her race. (Doc. No. 55 at 17-18.) *Meeks v. Computer Assocs. Int'l*, 15 F.3d 1013, 1021 (11th Cir. 1994) ("To recover for retaliation, the plaintiff 'need not prove the underlying claim of discrimination which led to her protest,' so long as she had a reasonable good faith belief that the discrimination existed." (quoting *Tipton v. Canadian Imperial Bank of Commerce*, 872 F.2d 1491, 1494 (11th Cir. 1989)).

Again, the problem for Plaintiff is that she cites no evidence in support of her argument that she believed she was protesting race discrimination. As previously noted, in Plaintiff's deposition testimony, she stated clearly and repeatedly that she believed she was subjected to discrimination and accused of practicing voodoo because she was from Jamaica, without reference to her race or her African ancestry/ethnicity. As Defendant points out, Plaintiff likewise made no mention of her race or ethnicity in any complaint to her employer or to the EEOC prior to filing this lawsuit. If any evidence exists that Plaintiff

believed she was protesting race-based discrimination against herself[11] when she lodged her complaints about discrimination and mistreatment with her employer and the EEOC, Plaintiff did not cite it in her brief. (Doc. No. 55 at 17-18.) Fed. R. Civ. P. 56(c)(1)(A) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by … citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials.").

Accordingly, Plaintiff's § 1981 claim is due to be dismissed because it is not supported by substantial evidence that Plaintiff was subjected to retaliation for protesting race discrimination.

B.      Title VII – Retaliation for Opposing National Origin Discrimination

Plaintiff contends that Defendant retaliated against her in violation of Title VII by terminating her employment for opposing discrimination that was directed at her based on her national origin. (Doc. No. 34 at ¶ 38.) Title VII prohibits employers from discriminating

---

[11] Plaintiff cites evidence that, on December 12, 2018, she submitted a sworn statement to the EEOC stating that unnamed employees of Defendant subjected an unnamed Jamaican management employee to racist insults. (Doc. No. 55 at 15; Doc. No. 56-3.) However, Plaintiff submits no evidence that Defendant knew about that statement or that there was any causal connection between that statement and the alleged retaliation against her, nor is Plaintiff's § 1981 claim predicated on a theory that she was subjected to retaliation for protesting race discrimination against the Jamaican management employee.

against employees "because of such [employee's] race,[12] color, religion,[13] sex, or national origin." 42 U.S.C.A. § 2000e-2(a). Title VII's anti-retaliation provision provides that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of [its] employees … because [s]he has opposed any practice made an unlawful employment practice by this subchapter, or because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a).

"To prevail on a Title VII retaliation claim, an employee must prove that (1) [s]he engaged in conduct protected by the retaliation provision, (2) [s]he suffered a materially adverse employment action, and (3) there was a causal relationship between the two." *Long v. Alabama Dep't of Hum. Res.*, 650 F. App'x 957, 967 (11th Cir. 2016). "The relationship required by the third prong is 'but-for' causation" – that is, but for the plaintiff's engagement in the protected conduct, the employer would not have taken the adverse employment action. *Id.* "A violation of [Title VII's] anti-retaliation provision can be established by direct or circumstantial evidence." *Furcron v. Mail Centers Plus, LLC*, 843 F.3d 1295, 1310 (11th Cir. 2016). On summary judgment, "[w]here … the plaintiff's evidence of retaliation is entirely circumstantial, the burden of proof shifts between the

---

[12] Plaintiff does not premise her Title VII claim on race discrimination or on retaliation for complaining of race discrimination. (Doc. No. 34 at ¶¶ 38-44.)

[13] Though Plaintiff was allegedly retaliated against for protesting her coworkers' accusations that she engaged in voodoo and witchcraft religious practices, her Title VII retaliation claim is not premised on alleged retaliation for opposing religious discrimination, nor does Plaintiff allege that she was subjected to discrimination in violation of Title VII based on her perceived religion. (Doc. No. 34 at ¶¶ 38-44.)

parties in accordance with the framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)."[14] *Furcron*, 853 F.3d at 1310. However, "[w]here the [plaintiff] presents direct evidence that, if believed by the jury, would be sufficient to win at trial, summary judgment is not appropriate even where the movant presents conflicting evidence." *Merritt v. Dillard Paper Co.*, 120 F.3d 1181, 1189 (11th Cir. 1997). Direct evidence is evidence that, "'if believed, proves … a fact without inference or presumption.'" *Id*. (quoting *Rollins v. TechSouth, Inc*., 833 F.2d 1525, 1528 n.6 (11th Cir. 1987)). "Evidence that only suggests discrimination… or that is subject to more than one interpretation … does not constitute direct evidence." *Id*. Whether by direct or indirect evidence, a plaintiff in a Title VII retaliation case must establish that retaliation was the

---

[14] The *McDonnell Douglas* burden-shifting framework is as follows:

> Initially, the employee must establish a prima facie case by demonstrating the following essential elements: (1) the employee was engaged in statutorily protected activity; (2) the employee suffered an adverse employment action; and (3) a causal link exists between the protected activity and the adverse employment action. *Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008) (citing *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001)). "Once a *prima facie* case has been established, the [employer] may come forward with legitimate reasons for the employment action to negate the inference of retaliation." *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir. 1993) (citing *Weaver v. Casa Gallardo, Inc*., 922 F.2d 1515, 1525–26 (11th Cir. 1991)[, *superseded by statute on other grounds*, Civil Rights Act of 1991, Pub. L. No. 102-166, 105 Stat. 1071]). If the employer is able to advance legitimate reasons for the adverse employment action, the burden shifts back to the employee to demonstrate, by a preponderance of the evidence, that the employer's reasons are pretextual. *Id.; Bryant* [*v. Jones*, 575 F.3d 1281, 1308 (11th Cir. 2009)]. "[A]t this stage ... the plaintiff's burden ... merges with the ultimate burden of persuading the court that [the plaintiff] has been the victim of intentional discrimination." *Smith v. Lockheed–Martin Corp*., 644 F.3d 1321, 1326 (11th Cir. 2011) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981)) (internal quotation marks omitted).

*Furcron*, 853 F.3d at 1310-11.

"but-for" cause of an adverse employment action. *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013).

Plaintiff contends that she has presented direct evidence of but-for causation.[15] Specifically, Plaintiff testified that Bibb informed her that she was being fired because, "ever since she filed a lawsuit or EEOC Charge, [she] had been complaining a lot."[16] (Doc. No. 55 at 10-11.) For purposes of summary judgment, despite Defendant's characterization of the conversation otherwise,[17] it is clear that Bibb's statement (as related by Plaintiff's testimony) indicated a but-for causal relationship between Plaintiff's termination and Plaintiff allegedly "complaining a lot" "ever since she filed" an EEOC charge. Though Plaintiff recalled Bibb's exact words with some variation throughout her testimony, she

---

[15] The parties do not dispute that, by filing an EEOC charge, Plaintiff engaged in protected conduct.

[16] Defendant disputes that Bibb made such a remark. (Doc. No. 51 at 2.) However, Plaintiff has presented sworn testimony that the remark was made; the credibility of that testimony (and of other witness's countervailing testimony) is a matter for the factfinder at trial, not for the court to decide on summary judgment. *Sears*, 922 F.3d at 1209 (holding that conflicts in competing testimony must be resolved in favor of the nonmovant on summary judgment); *Miller*, 458 F.3d 1256 ("Even if the district court believes that the evidence presented by one side is of doubtful veracity, it is not proper to grant summary judgment on the basis of credibility choices.").

[17] Defendant characterizes Bibb as simply having said, "[E]ver since [you] filed a lawsuit with the EEOC, you have been complaining a lot," and that this statement, standing alone, "is not a definitive statement that [Defendant] terminated [Plaintiff's employment] *because* she filed EEOC charges." (Doc. No. 57 at 6 (emphasis in original).) Defendant's characterization of Bibb's statement overlooks the fact that, where evidence conflicts on summary judgment, the court must resolve the conflict in the light most favorable to Plaintiff (the nonmovant), and Plaintiff certainly did testify that Bibb stated her employment was being terminated "because" she had been complaining a lot ever since she filed a lawsuit or an EEOC charge, or that Plaintiff had been complaining a lot since filing an EEOC charge, "so" she was fired. *See infra*, note 16. The conjunctions "because" and "so" are causal conjunctions, and they obviate any causal ambiguity Defendant is attempting to inject into Bibb's statement by ignoring them. *See Merritt v. Dillard Paper Co.*, 120 F.3d 1181, 1190 (11th Cir. 1997) (pointing out that a conjunction linking two thoughts in an employer's statement regarding the plaintiff's termination can be sufficient to "communicate cause and effect" between protected activity and the employer's motivation for firing the employee).

did reiterate that Bibb told her she was fired "because" of the complaints, or that she had been complaining "so" she was fired.[18] This is enough to show a direct causal relationship between the complaints Plaintiff had been making ever since she filed her EEOC charges and the termination. *See Merritt v. Dillard Paper Co*., 120 F.3d 1181, 1190 (11th Cir. 1997) ("It is immediately obvious that the second clause 'you no longer have a place at Dillard Paper Company' is linked by the conjunction 'and' to the first clause 'You are black' in such a way as to communicate cause and effect.").

Defendant argues that Bibb's statement is nevertheless open to interpretation, and therefore not direct evidence of discrimination, because the reference to Plaintiff complaining could be interpreted as (1) a "mere observation about the deterioration in [Plaintiff's] attitude after she filed EEOC charges" (Doc. No. 57 at 6) or (2) "as a factual reference to [Plaintiff's] problems with her coworkers since the filing of her EEOC charges" (Doc. No. 51 at 17 n.2).[19]

---

[18]   Doc. No. 52-3 at 26 (Plaintiff's testimony that "[Bibb's] statement was, 'Since you filed a lawsuit or EEO charges against [Defendant], you have been complaining a lot. Hand over your badge. You're fired.'"); *id*. at 47 ("So they point me to [Bibb's] office. And me and the union rep, Mr. Steve, went to the HR office to speak with [Bibb]. And that's what she told me that ever since I filed a lawsuit or an EEOC charge against [Defendant], I've been complaining a lot, *so* I'm terminated." (emphasis added)); *id*. at 52 ("[Bibb's] exact words was *because* I filed a lawsuit, an EEOC charge against [Defendant]. I don't know of any other reasons. That's what she said to me." (emphasis added)); *id*. ("Mr. Steve was mostly doing the talking, trying to get [Bibb] to let me keep the job. But she said I complained too much ever since I filed a lawsuit. And I told her I didn't – I never filed a lawsuit against [Defendant]. And she said she have to let me go *because* I'm complaining a lot since then." (emphasis added)); *id*. at 53 ("Bibb told me I was fired. The first meeting, she said – her exact words, 'Ever since you filed a lawsuit with the EEOC against [Defendant], you've been complaining a lot. *So* hand over your badge.' And she got the security to escort me. And she said, 'You're fired.' And she took my badge, and they escort me out the door." (emphasis added)).

[19] Defendant also argues that Bibb's statement could have been a reference to a statement Plaintiff allegedly made to a coworker that HR would not do anything to Plaintiff because she had filed a

Neither of Defendant's arguments is sufficient (or sufficiently presented) to introduce material ambiguity into Bibb's alleged statement for purposes of summary judgment. According to Plaintiff, Bibb stated that Plaintiff was being fired[20] because she was "complaining a lot" since she filed her EEOC charge, not because of the attitude with

---

lawsuit. (Doc. No. 51 at 17 n.2.) Defendant is overreaching. Any such statement by Plaintiff is not reasonably open to interpretation as a "complaint" (or at least Defendant has not explained how interpreting that statement as a complaint is justified by the facts of this case). Moreover, Defendant raises this argument in a footnote, and the Court is not required to consider it. *Doe v. Embry-Riddle Aeronautical Univ., Inc.*, No. 6:20-CV-1220-WWB-LRH, 2021 WL 2814905, at *2 (M.D. Fla. May 28, 2021); *see Pinson v. JPMorgan Chase Bank, Nat'l Ass'n*, 942 F.3d 1200, 1209 n.5 (11th Cir. 2019) ("We do not ordinarily consider arguments raised in passing in one footnote rather than the body of the brief."); *see also Chavous v. City of Saint Petersburg*, 576 F. Supp. 3d 1040, 1051 (M.D. Fla. 2021) (holding that a summary judgment brief's "oblique reference" to certain evidence, without more, "d[id] not suffice to establish a prima facie case of [FMLA] interference"). However, in the interest of considering an argument that has the surficial appearance of being worth discussion, the court has considered Defendant's argument that Bibb was making "a factual reference to [Plaintiff's] problems with her coworkers since the filing of her EEOC charges," which Defendant raised in the same footnote with no elaboration or elucidation. (Doc. No. 51 at 17 n.2.) For the reasons stated in this Memorandum Opinion and Order, that argument also fails.

[20] From the materials presented on summary judgment, it appears that Bibb made her statement regarding the cause of Plaintiff's firing or termination at the time Plaintiff was suspended pending investigation. Further, Plaintiff's deposition testimony suggests that, with respect to other suspensions, she considered suspension to be the same as termination. Plaintiff's retaliation case arises out of her termination, not her suspension. Defendant does not argue that the timing of Bibb's statement, alone or combined with Plaintiff's apparent conflation of suspension and firing, injects any ambiguity into Bibb's statement regarding the reason for Plaintiff's "terminat[ion]" or being "fired." Therefore, as with other potential arguments Defendant did not raise or adequately develop in its summary judgment brief, the Court will not consider whether the statement is ambiguous because of the timing of the statement, alone or in combination with Plaintiff's deposition testimony conflating being suspended on other occasions with being terminated. "There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment." *Resol. Tr. Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995). Instead, the "onus is on the parties to formulate" their arguments on summary judgment. *Id.*; *see Higgins v. New Balance Athletic Shoe, Inc.*, 194 F.3d 252, 260 (1st Cir. 1999) (holding that, on summary judgment, "[t]he district court is free to disregard arguments that are not adequately developed"); *Robinson-Miller v. Montgomery Cnty. Bd. of Educ.*, No. 2:18-CV-512-JTA, 2022 WL 13701300, at *15 n.15 (M.D. Ala. Oct. 21, 2022) (declining to consider arguments not raised in a brief in opposition to summary judgment).

which any such complaints were delivered. The statement is not reasonably open to an interpretation that Plaintiff was fired for her attitude rather than for her complaints.

Furthermore, while the court agrees with Defendant's contention that Bibb's statement is reasonably interpreted as a reference to Plaintiff's complaints about problems with her co-workers since she filed her EEOC charge,[21] Defendant did not go on to explain which complaints, if any, Bibb's statement could be referencing *other than* the complaints Plaintiff referenced in her brief that were related to problems caused by alleged discriminatory treatment by coworkers. According to Plaintiff's evidence, Plaintiff's "problems with her coworkers" were problems arising from their mistreatment of her because she was Jamaican. For example, the dispute between Plaintiff and her coworkers that immediately preceded her termination arose out of an incident that allegedly began when another employee told Plaintiff that "Donald Trump should send your ass back" and that "'[t]hey should send you back to Jamaica where you're from with your voodoo," after which another coworker sprayed her down with a hose and Plaintiff's coworkers laughed at her. (Doc. No. 52-3 at 45.)

Defendant failed to specify in its argument how Bibb could have been referring to complaints about problems with coworkers that were *unrelated* to alleged discriminatory conduct.[22] In Defendant's cursory footnote argument that Bibb was referring to Plaintiff's

---

[21] In fact, there appears to be no genuine dispute that the "complaints" referenced in Bibb's statement were Plaintiff's complaints about her problems with her coworkers.

[22] Again, "[t]here is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment." *Resol. Tr. Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995). Rather, the "onus is on the parties to formulate" their arguments on summary judgment, and "grounds alleged in the complaint but not relied upon in

complaints about coworkers, Defendant did not contend that Bibb's reference to complaints could have been made in ignorance of the fact that Plaintiff's complaints arose out of problems due to discriminatory conduct by her coworkers.[23] (Doc. No. 51 at 17 n.2.) Accordingly, Bibb's alleged statement is not reasonably open to interpretation for the reasons offered by Defendant on summary judgment. Therefore, the statement stands at this stage of the proceedings as direct evidence of retaliatory intent. Thus, summary judgment is inappropriate on Plaintiff's Title VII claim.[24]  *Celotex*, 477 U.S. at 323 (holding that "a party seeking summary judgment always bears the initial responsibility of

---

summary judgment are deemed abandoned." *Id; see also Higgins v. New Balance Athletic Shoe, Inc*., 194 F.3d 252, 260 (1st Cir. 1999) (holding that, on summary judgment, "[t]he district court is free to disregard arguments that are not adequately developed"); *Chavous v. City of Saint Petersburg*, 576 F. Supp. 3d 1040, 1051 (M.D. Fla. 2021) (holding that a summary judgment brief's "oblique reference" to certain evidence, without more, "d[id] not suffice to establish a prima facie case of [FMLA] interference").

[23] Elsewhere in its brief, Defendant contends that Bibb "had no knowledge of Plaintiff's purported internal complaints to human resources." (Doc. No. 51 at 16.) This contention (1) is diametrically opposed to Defendant's argument that Bibb's statement *was* referring to Plaintiff's complaints about her coworkers since filing her EEOC charge, (2) is not the same as an argument that Bibb knew about Plaintiff's complaints but not about their relationship to national origin discrimination, and (3) was not presented as part of Defendant's cursory argument in a footnote that Bibb's statement cannot be taken as direct evidence because she was referring to Plaintiff's complaints about problems with her coworker. Further, while Defendant contended elsewhere in its brief that Bibb may not have been aware of Plaintiff's EEOC charge when she informed Plaintiff of the termination (Doc. No. 51 at 16), that is an issue of disputed fact and runs contrary to Bibb's purported statement to Plaintiff (and contrary to other evidence, including Bibb's own deposition testimony (Doc. No. 52-1 at 22)); it cannot be taken as true for purposes of summary judgment.

[24] "'In the face of direct evidence, an employer must prove that the same employment decision would have been made absent any discriminatory intent.'" *Van Voorhis v. Hillsborough Cnty. Bd. of Cnty. Comm'rs*, 512 F.3d 1296, 1300 (11th Cir. 2008) (quoting *Carter v. City of Miami*, 870 F.2d 578, 582 (11th Cir. 1989)). On summary judgment, Defendant does not argue that it can overcome direct evidence of discrimination by showing that it would have terminated Plaintiff anyway; instead, it argues that Plaintiff has not presented direct evidence of discrimination and that Plaintiff cannot satisfy the *McDonnell Douglas* burden shifting standard with indirect evidence. Hence, Defendant has filed to satisfy its burden of overcoming direct evidence of discrimination.

informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions of file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact"); *Merritt*, 120 F.3d at 1189 ("Where the [plaintiff] presents direct evidence that, if believed by the jury, would be sufficient to win at trial, summary judgment is not appropriate even where the movant presents conflicting evidence.").

Alternatively, even if Bibb's alleged statement regarding the reason for Plaintiff's termination is not direct evidence of discrimination, it is enough to create a question of fact as to Defendant's true motive for terminating Plaintiff under the *McDonnell Douglas* burden shifting scheme for circumstantial evidence. The statement is sufficient to establish (or create a reasonable inference) that Defendant terminated Plaintiff's employment because of her complaints pertaining to incidents involving national origin discrimination her coworkers allegedly directed toward her, thus satisfying the *prima facie* case requirement of *McDonnell Douglas*. Defendant certainly has presented evidence of nondiscriminatory reasons for Plaintiff's termination. However, Bibb's alleged statement[25] of Defendant's actual motive for the termination is substantial evidence sufficient to support a reasonable inference that Defendant's proffered legitimate reasons were pretextual,[26] that Defendant fired Plaintiff because of her complaints about incidents of

---

[25] The Court pretermits consideration of whether Plaintiff has presented other evidence of Defendant's retaliatory motive, either as a part of the *prima facie* case or in rebuttal to Defendant's proffered nondiscriminatory reasons for the termination.

[26] In its summary judgment reply brief, Defendant argues that Plaintiff waived any argument that Defendant's proffered nondiscriminatory reasons for the termination were pretextual. (Doc. No. 57 at 9.) However, Plaintiff did sufficiently argue in its brief that, even if it were to be considered

discriminatory mistreatment by her coworkers and supervisors, and that those complaints were the but-for cause of her termination. *See Carter v. City of Miami*, 870 F.2d 578, 584 (11th Cir. 1989) ("Once a legitimate, nondiscriminatory reason for dismissal is put forward by the employer, the burden returns to the plaintiff to prove by significantly probative evidence that the proffered reason is a pretext for discrimination.").

## VII.   CONCLUSION

For the reasons stated in this Memorandum Opinion and Order, it is ORDERED as follows:

1.     Defendant's motion for summary judgment (Doc. No. 50) is GRANTED IN PART and DENIED IN PART.  The motion is GRANTED as to Plaintiff's § 1981 claims and DENIED as to Plaintiff's Title VII claim.

2.     Plaintiff's § 1981 claim is dismissed with prejudice.

3.     This case will proceed on Plaintiff's Title VII claim.

DONE this 9th day of June, 2023.

_Jerusha T. Adams_

JERUSHA T. ADAMS
UNITED STATES MAGISTRATE JUDGE

---

indirect evidence of Defendant's motivation, Bibb's statement, which was a statement of the true reason for Plaintiff's termination, was sufficient to survive summary judgment. (*See* Doc. No. 55 at 12 (argument and citation to *Yarbrough v. YKK U.S.A., Inc*., No. 1:20-CV-419-AT, 2021 WL 4901903 (N.D. Ga. June 29, 2021).) Therefore, the Court does not agree that Plaintiff waived any argument that Defendant's proffered reasons for the termination were not the true reasons for the termination, or that retaliation was the true reason for the termination.